■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ISAIAH T. CRISS, Appellant. [58 NYS3d 605]—

Lynch, J. Appeal from a judgment of the County Court of Broome County (Smith, J.), rendered May 22, 2014, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree.

On September 8, 2012, Jeremiah Reynolds (hereinafter the victim) was shot in the abdomen at The Rock B Tavern, a bar in the City of Binghamton, Broome County. After he was shot, the victim ran from the bar, was found lying in a nearby yard and taken by ambulance to the hospital where he later died. The next day, Robert Camber Jr. was arrested for the victim's murder, but charges were later dropped when investigators learned that it was defendant who shot the victim. On January 25, 2013, defendant was charged by indictment with murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. Following a jury trial, defendant was convicted of the first two counts. County Court thereafter denied defendant's CPL 330.30 motion to set aside the verdict based on, among other things, juror misconduct and the court's determination to allow a witness to testify about threats made by defendant's mother. The court sentenced defendant to concurrent prison terms of 25 years to life for his conviction of murder in the second degree and 15 years, followed by five years of post-release supervision, for his conviction of criminal possession of a weapon in the second degree. Defendant now appeals.

Initially, we reject defendant's argument that County Court improperly denied his pretrial request for a *Rodriguez/Wade*

hearing. The People did not provide notice that it intended to provide identification testimony (*see* CPL 710.30) and defendant requested a *Wade* hearing in his pretrial omnibus motion. The court allowed the People to present identification testimony, but cautioned that, if an identification procedure were used, then defendant could seek to preclude the testimony. In our view, the photographic identification procedures used here were not subject to the notice provisions of CPL 710.30 because defendant was known to the witnesses and photographs were confirmatory, that is, shown to the witnesses to put a name to the face (*see People v Heyliger*, 126 AD3d 1117, 1120 [2015], *lv denied* 25 NY3d 1165 [2015]; *People v Cobian*, 185 AD2d 452, 453 [1992], *lv denied* 81 NY2d 838 [1993]; *People v Cherny*, 179 AD2d 938, 938-939 [1992], *lv denied* 79 NY2d 998 [1992]). We find further that the court's pretrial *Sandoval* ruling was correct. Defendant sought to preclude the introduction of two prior convictions. The court ruled that if defendant chose to testify, then the People would only be permitted to question him about his 2011 conviction for criminal sale of a controlled substance in the third degree. We discern no abuse of discretion in the court's determination that this conviction was probative because it went "directly to the character trait of integrity" (*see People v Watson*, 150 AD3d 1384, 1387 [2017]; *People v Reid*, 97 AD3d 1037, 1037-1038 [2012], *lv denied* 19 NY3d 1104 [2012]).

Next, defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. Although defendant's general trial motion to dismiss was not specific enough to preserve his challenge to the legal sufficiency of the evidence (*see People v Hawkins*, 11 NY3d 484, 492 [2008]), we necessarily consider the elements of the crimes charged when we weigh the evidence to determine whether each element was proved beyond a reasonable doubt (*see People v Danielson*, 9 NY3d 342, 349 [2007]; *People v Bullock*, 145 AD3d 1104, 1105 [2016]). This review requires us first to decide whether, "based on all the credible evidence[,] a different finding would not have been unreasonable," and then, "like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (*People v Bleakley*, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]; *see People v Murrell*, 148 AD3d 1296, 1297 [2017]). When conducting a review of the weight of the evidence, we view the evidence in a neutral light and defer to the jury's credibility assessments (*see People v Crooks*, 129 AD3d 1207, 1208 [2015], *affd* 27 NY3d 609 [2016]).

A defendant is guilty of murder in the second degree if the proof established " 'that [the] defendant caused the victim's death after having acted with the intent to do so' " (*People v Morgan*, 149 AD3d 1148, 1149-1150 [2017], quoting *People v Wlasiuk*, 136 AD3d 1101, 1102 [2016], *lv denied* 27 NY3d 1009 [2016]; *see* Penal Law § 125.25 [1]). A defendant is guilty of criminal possession of a weapon in the second degree if he or she "possesses a loaded firearm" with the intent to use it unlawfully against another person (Penal Law § 265.03 [1] [b]; *see People v Bost*, 139 AD3d 1317, 1318 [2016]).

Kristel Slater, the victim's girlfriend, testified that approximately one week before the shooting, she and the victim were walking home when they came upon a group fighting with a young man that she recognized. Slater testified that, when the victim's attempt to break up the altercation was unsuccessful, he became engaged in a fight with Rayshaun Cauthan and Mustapha Wesley. Slater's sister testified that she had observed defendant, Cauthan and Wesley together in the past, and Angela Proctor, a bartender at The Rock B, confirmed that Cauthan and defendant were friends. Against this historical backdrop, the People's theory was that defendant shot the victim to avenge Cauthan and Wesley's prior altercation with the victim.

The trial testimony established that the morning that the victim was shot, defendant, Cauthan and Wesley were at The Rock B. Video footage obtained from a nearby "pole camera" also showed defendant entering, leaving and reentering the bar prior to the shooting. Camber, his cousin Frank Barnett Jr., Eladio Murphy and Curtis Johnson were also there celebrating Murphy's birthday. Hope Gaines Cole, who was also there, testified that she knew Camber, Barnett, Murphy and defendant, and that she recalled seeing all four at the bar. There was conflicting testimony with regard to whether these patrons were searched prior to entering and/or reentering the bar, and the bouncer testified that it was not likely that he searched everyone at the door.

Cole testified that, from where she was sitting in The Rock B, she could see the entryway to the bar and the bouncer. She saw defendant leave the bar and return shortly thereafter and noticed that when he returned, he was not searched, and she could see a gun in his hand. Defendant walked by Cole and shot the victim, who was standing in the corner approximately eight feet away from where she was sitting. The victim ran from the bar and defendant chased after him. Barnett testified that he was also at The Rock B and saw defendant—who he

had known for approximately six years—walk past him and approach the victim. The two began arguing and defendant shot the victim with what Barnett believed was a small handgun. Barnett testified that he watched the victim run from the bar and defendant leave after him. Barnett then went to find Camber and the two left to try to find the victim.

James Zeggert Jr. and Shanika Maiden, friends of Barnett and Camber, testified that they were in the parking lot when they heard a gunshot and watched as people began coming out of the bar. Zeggert testified that he saw the victim stagger out of the bar and run off and that there were two men chasing after him, pushing through the crowd. Moments later, Zeggert heard a second gunshot coming from the direction in which the three men had run. Maiden testified that she also heard the gun shot and saw the victim run from the bar with two men following him. Defendant was one of the two men that she saw chasing the victim from the bar. Maiden testified that she saw defendant holding a small handgun and that when defendant was approximately 10 feet from her car, she saw him shoot the gun toward the victim as they continued running down the street. Maiden testified that Camber and Barnett came out of the bar after this happened, approached her car and that Camber asked her to follow him as he went in his car to find the victim, whom he characterized as "[his] man." They circled around the block a number of times before the police pulled her over for questioning.

Jacinda Collins, who lived near The Rock B, testified that she was in her upstairs bedroom when she heard a loud noise that sounded like a gunshot. She went to her window and observed a man lying in the neighbor's backyard and two men running away in different directions. Collins testified that she next saw a car pull up and two men get out. Slater, Camber and Barnett all testified that they drove together to the scene where the victim was found. Barnett and Camber testified that Camber was on the ground with the victim trying to comfort him. Slater testified that she was doing the same until the paramedics arrived. When the police arrived, they apprehended Camber and Barnett as suspects in the shooting. Collins testified initially that she saw two men being handcuffed but that the two men were not the same as those that she saw running from the scene. She later confirmed that she was not sure and that she was also not sure how many men she saw running away from the victim.

Cole and Barnett both conceded that they did not tell the police what they saw at The Rock B. Cole testified that she did

not disclose what she knew because "we all [were] supposed to say [that] three guys from Elmira did the shootin[g] and booked," and Barnett testified that he was "nervous about the whole situation." Maiden confirmed during her testimony that she initially gave a statement to police identifying Barnett as the shooter and, later, in another written statement, she identified Camber as the shooter. A few days later, she told the police that she had received several telephone calls from members of Camber's family requesting that she provide false information to the police. During her grand jury testimony, she testified that she did not know who shot the victim. At trial, Maiden testified that she lied because she was terrified of her son's father, who she believed was friends with defendant as she had seen them together approximately seven or eight times in the past. Further, she testified that prior to her appearance at defendant's trial, she had received threats from her son's father and defendant's mother that she believed were intended to dissuade her from testifying.

Defendant now argues that the evidence against him was "weak" and not credible. The People's evidence included two eyewitnesses who saw defendant shoot the victim with a handgun from close range, and, although no gun was found, a bullet was found in the victim's body. In our view, a contrary verdict would not have been unreasonable because the jury could have agreed with defendant's assessment of the proof and discredited the eyewitness testimony (*see People v Wlasiuk*, 136 AD3d at 1102). Where, as here, a verdict depends on a credibility determination, "[w]e accord deference to the factfinder's opportunity to view the witnesses, hear the testimony and observe demeanor" (*People v Salce*, 124 AD3d 923, 926 [2015] [internal quotation marks and citations omitted], *lv denied* 25 NY3d 1207 [2015]). Here, the conflicting testimony and credibility issues were "fully explored during cross-examination and, in the final analysis, posed credibility questions for the jury to resolve" (*People v Wells*, 141 AD3d 1013, 1023 [2016] [internal quotation marks and citation omitted], *lv denied* 28 NY3d 1189 [2017]). When we give the requisite deference to the jury's credibility assessment and view the evidence in a neutral light, we find that the verdict was supported by the weight of the evidence (*see People v Morgan*, 149 AD3d at 1151; *People v Rivera*, 124 AD3d 1070, 1073-1074 [2015], *lv denied* 26 NY3d 971 [2015]).

Next, we find that County Court properly denied defendant's CPL 330.30 motion. Defendant argued that the court should have set aside the verdict because the jury panel was tainted,

Maiden was allowed to testify with regard to threats made against her and the court admonished defendant's supporters in the courtroom in the presence of the jury. To the extent that these claims were preserved for our review, we disagree. Defendant argues that the jury was tainted because one juror reported to at least one other juror that she had heard gunshots outside of her home the night before and she was scared. In the presence of counsel and defendant, the court questioned the two jurors individually, ultimately excused one juror and then spoke to the remaining jurors in a group. Defendant's argument that each juror should have been questioned is not preserved for our review and, otherwise, we find that the court's determination that the remaining jurors were able to serve on the jury was supported by the record (*see People v Miller*, 118 AD3d 1127, 1129-1130 [2014], *lv denied* 24 NY3d 1086 [2014]). We are not persuaded by defendant's argument that County Court erred by allowing Maiden to testify about threats made by defendant's mother. "Such evidence is a factor upon which a jury can infer the defendant's consciousness of guilt" (*People v Myrick*, 31 AD3d 668, 669 [2006] [internal quotation marks and citation omitted], *lv denied* 7 NY3d 927 [2006]; *see People v Williams*, 139 AD3d 885, 886 [2016], *lv denied* 28 NY3d 1076 [2016]). In our view, there was evidence to connect defendant to the threat made by his mother, and the court properly instructed the jury that it was free to reject Maiden's testimony and to find otherwise (*see People v Jones*, 21 NY3d 449, 456 [2013]; *People v Myrick*, 31 AD3d at 669).

We reject defendant's argument that he was denied the effective assistance of counsel. Defendant claims that his trial counsel was not prepared and failed to file a motion to preclude identification testimony. "In order to sustain a claim of ineffective assistance of counsel, a court must consider whether defense counsel's actions at trial constituted egregious and prejudicial error such that [the] defendant did not receive a fair trial" (*People v Oathout*, 21 NY3d 127, 131 [2013] [internal quotation marks and citations omitted]). A claim will fail "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (*People v Wright*, 25 NY3d 769, 779 [2015] [internal quotation marks, brackets and citations omitted]). "There can be no denial of effective assistance of trial counsel arising from counsel's failure to make a motion or argument that has little or no chance of success" (*People v Caban*, 5 NY3d 143, 152 [2005] [internal quotation marks and citation omitted]). Here, defense counsel gave a coherent opening statement, made ap-

propriate objections and effectively cross-examined each of the People's witnesses, not only with regard to their inconsistent statements, but also with regard to the amount of alcohol and marihuana each consumed during the evening prior to the shooting. Based on our review of the record as a whole, we find that defendant received meaningful representation (*see People v Brandon*, 133 AD3d 901, 903 [2015], *lv denied* 27 NY3d 992 [2016]; *People v Rotger*, 129 AD3d 1330, 1332 [2015], *lvs denied* 26 NY3d 1011 [2015], 27 NY3d 1005 [2016]).

Finally, defendant argues that the sentence imposed was harsh and excessive. In light of the severity of the crime and defendant's criminal history, we discern no abuse of discretion nor any extraordinary circumstances that would warrant a reduction of the sentence (*see People v Jones*, 139 AD3d 1189, 1191 [2016], *lv denied* 28 NY3d 932 [2016]).

Peters, P.J., Garry, Clark and Aarons, JJ., concur. Ordered that the judgment is affirmed.