People v Childs
2026 NY Slip Op 03846
June 18, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Hassan Childs, Appellant.

Decided and Entered:June 18, 2026
CR-23-0723
Calendar Date: April 29, 2026
Before: Clark, J.P., Aarons, Pritzker, Mackey And Corcoran, JJ.

Steven M. Sharp, Albany, for appellant.
Danielle Neroni Reilly, Special Prosecutor, Albany, for respondent.

[*1]
Clark, J.P.
Appeal from a judgment of the County Court of Albany County (Dan Lamont, J.), rendered July 30, 2004, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree.
On June 7, 2002, a 16-year-old boy (hereinafter the victim) was shot to death in the City of Albany. Defendant was arrested in connection with the shooting and charged by indictment with intentional murder in the second degree, depraved indifference murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. Following a jury trial, defendant was convicted of intentional murder and both weapon possession charges, but he was acquitted of the depraved indifference charge. He was sentenced to concurrent prison terms on the convictions, amounting to an aggregate prison term of 25 years to life, to be followed by five years of postrelease supervision. Defendant appeals.FN1
Defendant argues that the verdict is not supported by legally sufficient evidence and is contrary to the weight of the evidence, contending that the People did not establish his identity as the shooter or his intent to cause the victim's death, rendering the murder conviction unsustainable. He additionally argues that, without sufficient evidence that he was the shooter, the weapon possession convictions, which were predicated on such a finding, must also be reversed. Defendant's legal sufficiency argument is unpreserved, as his generalized motion for a trial order of dismissal at the close of the People's case-in-chief did not make the specific arguments he raises on appeal and he did not expand upon the motion when renewing it at the close of defendant's proof (see People v Greene, 244 AD3d 1391, 1393 [3d Dept 2025], lv granted 44 NY3d 1069 [2026]; People v Baber, 182 AD3d 794, 795 [3d Dept 2020], lv denied 35 NY3d 1064 [2020]). Nevertheless, we review whether the People proved each element of the subject crimes beyond a reasonable doubt in the context of defendant's weight-of-the-evidence challenge, which bears no preservation requirement (see People v Monk, 237 AD3d 1250, 1251 [3d Dept 2025]; People v Franklin, 216 AD3d 1304, 1305 [3d Dept 2023], lv denied 40 NY3d 934 [2023]).
In that regard, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person"
(Penal Law § 125.25 [1]). As relevant here, at the time defendant was indicted on the underlying charges, "[a] person [wa]s guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another . . . he [or she] possesse[d] a loaded firearm" (Penal Law § 265.03 [former (2)]) and "[a] person [wa]s guilty of criminal possession of a weapon in the third degree when . . . [s]uch person possesse[d] any loaded firearm," [*2]unless the possession occurred "in such person's home or place of business" (Penal Law § 265.02 [former (4)]). The People were also required to prove that the firearm defendant possessed was operable (see People v Longshore, 86 NY2d 851, 852 [1995]).
At trial, the People called the victim's mother to testify about an altercation she observed between defendant and the victim two days before the victim's death. She explained that she was sitting outside at her neighbor's house when she observed the victim and defendant "getting ready to fight" and stepped between them. The victim's mother backed the victim away from defendant and, as she did so, she saw defendant smirk and heard him say "I got you, boy . . . I got you." The last time the mother saw the victim alive was on the evening of June 7, 2002, when he was at home getting ready to go to a party. The mother testified that the victim left the house around 10:15 p.m. that evening and, a little while later, she was informed that he had been shot outside of a bar in the City of Albany.
The People presented testimony from several eyewitnesses in an attempt to establish defendant's identity as the shooter, including from an individual who worked at the subject bar (hereinafter witness A) and heard gunfire shortly after she left the establishment at the end of her shift. Witness A explained that she heard gunshots while she was sitting in an associate's car at a red light a little bit up the street from the bar and thereafter saw two or three young men wearing black hoodies holding the victim down. Witness A testified that the victim "shimmied out of [his] coat" and ran in the direction of the bar. She further testified that the boys who had been holding the victim down then "jumped into a [white] car," which proceeded down Third Street near the intersection of North Lake Avenue, running a red light in the process. Witness A identified the vehicle as a white Honda Civic that had a bumper sticker for "The Edge" radio station on it. She was able to observe the driver of the vehicle, an individual she was familiar with who was not defendant. Witness A then proceeded back to the bar, where she saw the victim on the ground bleeding.
An individual referred to as "Giggetts" also testified on the People's behalf, explaining that he was smoking marihuana in his girlfriend's parked car outside of the subject bar a little after 11:00 p.m. on June 7, 2002 when he observed the shooting. As for the circumstances leading up to the shooting, Giggetts observed three people yelling back and forth on the sidewalk, identifying both the victim and defendant as among the group fighting. At one point during the ordeal, he saw defendant wearing the victim's chain, saw them exchange words, and observed defendant pull a revolver from his waist. Giggetts testified that he then saw "some orange come out of the gun" and heard a gunshot, confirming that the gun was fired in the victim's direction. Like witness A, Giggetts also [*3]recalled seeing a white Honda Civic after hearing the gunshot and observed defendant get into the vehicle.
Police eventually located the driver of the white Honda Civic (hereinafter witness B) and he testified on the People's behalf at trial, confirming that the vehicle belonged to him and that he was in the vicinity of the bar on the evening in question. Witness B explained that, prior to the shooting, he drove past the subject bar and saw defendant, with whom he was familiar. Witness B then pulled over down the street from the bar and sat in his car "rolling" up a marihuana joint. Approximately five minutes later, witness B heard shots, saw people running and saw "flashes coming from" defendant's hands. He further testified that defendant then "ran to [his] car, opened the door, and said he needed a ride home." Witness B dropped defendant off at a specific address in the Dudley Heights apartment complex in the City of Albany. Thereafter, he noticed an unmarked police vehicle following him, prompting him to pull his vehicle over and to cooperate with police in the ensuing investigation.
Another witness (hereinafter witness C) also testified about his observations on the evening in question, explaining that he had consumed alcohol at the subject bar prior to the shooting and, when he left the establishment, observed the victim and defendant arguing on the sidewalk. Witness C testified that he then walked down the block and, when he turned around, he saw defendant holding a revolver and "s[aw] a shot go off." Although witness C only remembered seeing one shot go off, he recalled hearing several shots and confirmed that defendant had fired the gun in the victim's direction. At trial, defense counsel cross-examined witness C about his prior criminal history, including a favorable plea deal he had been offered by the People in exchange for his testimony in the underlying case.
The People also elicited testimony from an individual employed with the Albany City School District (hereinafter witness D), who testified that, on the evening in question, he was in the vicinity of the subject bar with a friend who was a detective when he heard a call come in over the detective's radio pertaining to a shooting and a white Honda Civic. The Honda then passed by witness D and the detective while they were standing outside and witness D observed two men in the vehicle, identifying one of them as defendant. The detective who was with witness D on the evening in question confirmed such testimony, explaining that they were together in the vicinity of the bar during the late evening hours of June 7, 2002 when a call came over his radio about a shooting along with a description of a vehicle believed to be involved. The detective also recalled seeing the subject vehicle drive past them, identifying it by the distinctive bumper sticker, and he observed defendant seated in the passenger's seat. The detective followed the vehicle to the Dudley Heights apartment complex and [*4]he observed defendant get out of the vehicle.
In addition to the foregoing, the People also elicited testimony from a uniformed patrol officer who encountered defendant a day after the shooting. The patrol officer testified that, when defendant spotted him, defendant "took off running down an alleyway . . . toward[ ] a wooded area" behind several houses. Although the patrol officer was unsuccessful in apprehending defendant during a foot pursuit, police officers set up a perimeter and a K-9 unit was called to assist in locating him. A police dog ultimately tracked defendant's scent to the same apartment in the Dudley Heights apartment complex where witness B had dropped defendant off after the shooting, but defendant could not be located there when police arrived. Police subsequently obtained a search warrant for the residence, where defendant was residing with his girlfriend on the date in question, and executed the warrant on June 8, 2002. Defendant was not present at the residence at that time and he was not apprehended until several months later, when the US Marshal's Service located him in Virginia.
As for the forensic evidence in this case, no projectiles or shell casings were located in the vicinity of the subject bar. However, several bullet holes were found in the victim's clothing, including in his jeans and on the back of his sweatshirt, and a projectile was pulled from his body during an autopsy. Two days after the subject shooting, police located a .38 caliber, five-shot revolver laying in vegetation within a wooded area "[a]bout [10] to [15] yards" behind the residence at the Dudley Heights apartment complex where defendant had been dropped off after the shooting. The revolver had five expended shell casings in it when it was found. One of the detectives who located the gun believed that it had been deliberately placed in the wooded area only a couple of days prior, due to the manner in which it was positioned, the fact that the vegetation beneath it was "still green and healthy" and given that the "weapon itself still had a nice shine to it," signifying that "it had not been out in the elements for a long period of time." Witness B, who had driven defendant in the white Honda Civic, testified at trial that he did not place the subject revolver in the wooded area behind such residence. No latent fingerprints were located on the gun, but the People presented evidence that defendant had a tattoo on his arm bearing the phrase "gun dumper."
The forensic pathologist who performed the victim's autopsy located "multiple gunshot wounds along [his] body, especially along the back," and was able to confirm that the gunshot wounds on his back were entrance wounds. Five distinct gunshot wounds were located during the victim's autopsy. A police officer test-fired the revolver found in the wooded area behind the residence where defendant was living with his girlfriend on the date in question, determined that the gun was operable, and concluded [*5]that the projectile provided to him from the victim's body was "consistent with having come from that revolver."
Defendant took the stand at trial, confirming that he had been in an altercation with the victim on June 5, 2002 over a video game and that the victim's mother separated them. Defendant testified that, as the victim and his mother were backing away from him, he stated, "If it's really that serious, I'll go get your video game," and he then walked away. Defendant maintained that he never saw the victim again after that date, testifying that he spent "all day" with his girlfriend at her residence in the Dudley Heights apartment complex on June 7, 2002 and that he only left the apartment on one occasion, around 10:15 p.m., to borrow a DVD from his girlfriend's mother, who lived down the street. Defendant testified that he was at the mother's house for 15 to 20 minutes before he returned to his girlfriend's house, after which he watched the movie and fell asleep. Defendant denied having gone to the bar near where the victim was shot on the evening in question, maintained that he was not in possession of a .38 caliber, five-shot revolver that evening, had never seen the revolver retrieved from behind his girlfriend's building and did not shoot the gun. He also denied fleeing from police on June 8, but acknowledged that he traveled to Virginia that same day, claiming that he did so after learning from friends that he was in the news as a suspect in a murder investigation.
Defendant's girlfriend also testified on his behalf, stating that defendant was home with her and their son on the evening of June 7, 2002, that he briefly left the apartment to retrieve a DVD from her mother's house and that he was gone for approximately 20 minutes, after which he watched the DVD on their couch.FN2 The girlfriend maintained that defendant was still on the couch when she woke up at 5:00 a.m. the next morning and that he left the apartment later that day after they had a disagreement.
Turning to the analysis, we conclude that a different verdict would not have been unreasonable had the jury believed defendant's testimony about the evening in question and the alibi witnesses he presented in that regard. Nevertheless, when viewing the evidence in a neutral light and "weigh[ing] the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" we are satisfied that the People proved the crimes for which defendant was convicted beyond a reasonable doubt (People v Cipriani, 244 AD3d 1304, 1305 [3d Dept 2025] [internal quotation marks and citations omitted], lv denied 44 NY3d 1065 [2026]; see People v Bleakley, 69 NY2d 490, 495 [1987]). The jury's finding that defendant was the shooter was supported by the testimony of three eyewitnesses, who each independently confirmed that they saw defendant shoot a firearm toward the victim. Although defendant correctly notes that these witnesses had [*6]prior criminal histories, were testifying to secure favorable plea deals on unrelated charges or had made prior inconsistent statements regarding the evening in question, these issues were the subject of vigorous cross-examination by defense counsel. We defer to the jury's credibility assessments in conducting a weight-of-the-evidence analysis (see People v Moore, 247 AD3d 1251, 1252 [3d Dept 2026]), and we note that the identification testimony was supported by independent evidence, including the revolver being recovered from the wooded area directly behind the residence where defendant was living, the revolver having five expended shell casings in it when it was found and the victim suffering from five distinct gunshot wounds. Moreover, the jury could infer consciousness of guilt from the testimony that defendant ran when he encountered police the day after the shooting and then fled to Virginia. Considering all of the evidence, and according due deference to the jury's credibility determinations, defendant's identity as the shooter was supported by the weight of the evidence (see People v Demellier, 174 AD3d 1120, 1123 [3d Dept 2019], lv denied 34 NY3d 980 [2019]; People v Criss, 151 AD3d 1275, 1279 [3d Dept 2017], lv denied 30 NY3d 979 [2017]). The jury's finding that defendant had the intent to kill is also supported by the weight of the evidence, including the proof that the victim was shot five times, all in the back (see People v Warner, 194 AD3d 1098, 1104 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]; People v Guy, 93 AD3d 877, 881 [3d Dept 2012], lv denied 19 NY3d 961 [2012]). We reach the same conclusion as it pertains to the gun possession charges, as defendant necessarily possessed a loaded firearm with the intent to use it against another in committing the underlying shooting and the gun was operable (see Penal Law §§ 265.03 [former (2)]; 265.02 [former (4)]; People v Longshore, 86 NY2d at 852).
Next, we address defendant's argument that County Court erred in submitting both the intentional murder and the depraved indifference murder charges to the jury insofar as they were inconsistent counts.FN3 By the time that the underlying charges were submitted to the jury, the Court of Appeals had clarified that "intentional and depraved indifference murder are inconsistent counts" insofar as "a person cannot act both intentionally and recklessly with respect to the same result" (People v Gonzalez, 1 NY3d 464, 468 [2004]). Although the Court of Appeals subsequently elucidated that " 'twin-count' indictments — charging both intentional homicide and depraved indifference murder — should be rare" and "[t]win-count submissions to a jury, even rarer" (People v Suarez, 6 NY3d 202, 215 [2005]; see also People v Feingold, 7 NY3d 288, 294 [2006]; People v Payne, 3 NY3d 266, 272 [2004]), at the time that the charges were submitted to the jury, where an indictment charged counts of intentional murder and depraved indifference murder based upon a single [*7]homicide, both counts could be submitted to the jury if they were submitted in the alternative and there was a reasonable view of the evidence to support both theories (see People v Gonzalez, 1 NY3d at 468; People v Gallagher, 69 NY2d 525, 528 [1987]; see also CPL 300.30 [1]; CPL 300.40 [5]).
Here, when submitting both murder counts to the jury, County Court provided an inconsistent count charge, explaining that the jury could find defendant guilty of either intentional murder or depraved indifference murder, but not both (see CPL 300.40 [5]). The court also informed the jury that "if the People have failed to establish guilt beyond a reasonable doubt of either [count] . . . , the jury should then return a verdict of not guilty of both such crimes." Defendant polled the jury following their verdict, and the jury made clear that it was unanimous in finding defendant guilty of intentional murder. Correspondingly, the jury acquitted defendant of the depraved indifference murder charge. In these circumstances, even if County Court erred in submitting both murder counts to the jury, doing so did not prejudice defendant and the error was harmless (see People v Diaz, 35 AD3d 226, 226 [1st Dept 2006], lv denied 8 NY3d 921 [2007]; People v Griffin, 28 AD3d 578, 579 [2d Dept 2006], lv denied 7 NY3d 789 [2006]; compare People v Molina, 79 AD3d 1371, 1374 [3d Dept 2010], lv denied 16 NY3d 861 [2011]).
Turning to defendant's sentencing challenge, we decline his request to reduce the sentence in the interest of justice. Notwithstanding defendant's young age and limited criminal history at the time of the underlying crimes, when considering all of the relevant circumstances, we do not view the sentence imposed to be unduly harsh or severe (see CPL 470.15 [b] [6]; People v Guevara, 240 AD3d 1083, 1089 [3d Dept 2025], lv denied 44 NY3d 1028 [2025]). Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found unavailing.
Aarons, Pritzker, Mackey and Corcoran, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1
Defendant filed a notice of appeal with the Albany County Clerk's office in July 2004, but his counsel never perfected the appeal in this Court. Defendant learned of that fact in March 2023, when he called this Court's Clerk's office to inquire about the status of his appeal and learned that the Court had no record of it. New counsel was subsequently assigned to represent defendant. This Court granted his motion to treat the notice of appeal as timely and for an extension of time to perfect the appeal.

Footnote 2
The girlfriend's mother testified consistently with the girlfriend in that regard, stating that defendant retrieved a DVD from her residence around 10:15 p.m. on June 7, 2002 and that she believed he returned to the girlfriend's residence thereafter.

Footnote 3
To the extent defendant argues that submitting the depraved indifference murder count to the jury violated his constitutional rights, such argument is unpreserved insofar as he did not make that argument at the trial court level (see CPL 470.05 [2]).